In the

# United States Court of Appeals
### For the Seventh Circuit

————————

No. 13-2434

ANDREW GOESEL and CHRISTINE GOESEL,
individually and as next friend to
COLE GOESEL, a minor,

*Plaintiffs*,

*v.*

BOLEY INTERNATIONAL (H.K.) LTD., *et al.*,

*Defendants*.

Appeal of: WILLIAMS, BAX & SALTZMAN, P.C.,

*Appellant*.

————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09-cv-4595 — **Milton I. Shadur**, *Judge*.

————————

ARGUED OCTOBER 29, 2014 — DECIDED NOVEMBER 5, 2015

————————

Before RIPPLE, KANNE, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. The law firm of Williams, Bax &
Saltzman, P.C., represented Cole Goesel and his parents in a
personal-injury suit that settled prior to trial. Because Cole

was a minor, the law firm needed judicial approval to finalize the settlement. The parties' contingent-fee agreement entitled the firm to one-third of the gross settlement, while all litigation expenses would be covered by the Goesels' share.

The district court refused to approve the settlement unless litigation expenses were deducted off the top and one-third of the *net* settlement was allocated to the firm. The judge also rejected the firm's attempt to count the cost of computerized legal research as a separately compensable litigation expense rather than rolling it into the fee recovery. The firm appealed the judge's order limiting its fees. The Goesels declined to participate, so we appointed an amicus to argue in support of the decision below.

We now reverse. Though the district court enjoys substantial discretion to safeguard the interests of minors in the settlement of litigation, this discretion is not boundless. Here, the judge criticized aspects of the firm's contingent-fee agreement that have received the express blessing of Illinois courts. Once these improper reasons are stripped away, the only rationale that remains—namely, that "fairness and right reason" require that the Goesels receive 51% of the gross settlement amount rather than 42%—is insufficient to justify discarding a reasonable contingent-fee agreement.

## I. Background

In 2007 five-year-old Cole Goesel was injured when a toy robot shattered and punctured the lens of his right eye. Cole's parents, Andrew and Christine Goesel, retained the law firm of Williams, Bax & Saltzman, P.C., to sue on Cole's

behalf. The retainer agreement between the parties stipulated that the firm would receive one-third off the top of any gross settlement or judgment and the Goesels would be responsible for litigation expenses; but in the event of no recovery, the Goesels were off the hook for both expenses and attorney's fees.

In 2009 the firm filed a lawsuit on the Goesels' behalf in Illinois state court, which the defendants removed to federal court based on diversity jurisdiction. Nearly four years of contentious litigation ensued, ultimately focusing on two issues: (1) the appropriateness of the material used in the shattered part of the toy, and (2) the severity of Cole's injuries. These questions necessitated the retention of multiple expert witnesses, including chemists, toy-safety specialists, ophthalmologists, and rehabilitation counselors. The litigants also conducted extensive discovery, including depositions in seven states and a videoconference with deponents in Hong Kong.

The parties settled on the eve of trial. The defendants agreed to pay $687,500. Under the retainer agreement, the firm's one-third of the gross settlement amount was $229,166.67, and litigation expenses totaled $172,949.19, leaving the Goesels with $285,384.14, or roughly 42% of the total recovery.

Because Cole was a minor at the time of the litigation, the federal court's local rules and the Illinois Probate Act required court approval before the settlement could be finalized. N.D. ILL. L.R. 17.1; 755 ILL. COMP. STAT. 5/19-8. At a hearing to determine whether to place the settlement details under seal, the district judge launched sua sponte into his objections to the contingent-fee agreement. He noted first

that the case required "a very large amount of out-of-pocket expenditure," and those costs were "certainly expended reasonably here." He also acknowledged that the firm had done "a terrific job for the client." But the judge was "very troubled" by the clients' bottom line—specifically, that the Goesels would "end[] up with something like 40 percent of the total recovery," the rest having been eaten up by litigation costs and the law firm's fee.

The judge asked the firm whether the approach of deducting the contingent fee prior to expenses comported with industry practice. In response the firm amended its initial submission to address the judge's inquiry as well as to argue more vigorously that Cole's ultimate recovery was "sufficient to not only cover any future medical needs but … also sufficient to compensate him for his pain and suffering." The judge bristled at this, calling it a "subjective comment on the asserted value of the minor child's pain and suffering." But the judge acknowledged "that the terms in contingent fee agreements are not of a one-size-fits-all nature." He also noted that Rule 1.5(c) of the Illinois Rules of Professional Conduct expressly permits "litigation and other expenses to be deducted from the recovery" and expenses may be "deducted before or after the contingent fee is calculated." Accordingly, the judge concluded that "counsel's request … certainly cannot be characterized as per se unreasonable."

Still, the judge remained concerned about the child's recovery. Invoking "fairness and right reason," the judge modified the fee structure so that the litigation expenses were deducted off the top, prior to the one-third allocation to the law firm. He also excluded the firm's Westlaw charges from reimbursable litigation expenses. The judge according-

ly authorized fees in the amount of $174,730.47; reimburse-
ment of litigation expenses in the amount of $163,308.59; and
disbursement of $349,460.94 to Cole.

The law firm appealed in its own right, as it is entitled to
do. *See In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 743
(7th Cir. 2011). Though informed of their pecuniary stake in
this appeal, the Goesels declined to participate. We appoint-
ed an amicus to argue in support of the district court's
decision.[1]

## II. Discussion

### A. Applicable Law

A threshold question is whether state or federal law gov-
erns this appeal. The district court cited both Local Rule 17.1
and the Illinois Probate Act as controlling authority. Local
Rule 17.1 requires "written approval by the court" before a
"proposed settlement of an action brought by or on behalf of
an infant or incompetent … become[s] final." The rule also
states that the district court may "authorize payment of
reasonable attorney's fees and expenses from the amount
realized in such an action." But the rule is silent as to the
substantive criteria governing the reasonableness inquiry.

Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938),
and its progeny, federal courts sitting in diversity apply state
substantive law using federal procedural rules. For federal
rules to apply, "[t]he test must be whether a rule really

---

[1] The court thanks Thomas L. Shriner, Jr., and Eric G. Pearson of Foley &
Lardner LLP for their amicus curiae brief in support of affirmance.

regulates procedure—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941). This approach serves "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Hanna v. Plumer*, 380 U.S. 460, 468 (1965).

"[I]n a diversity suit, the damages rules of the state whose law governs the substantive issues in the case bind the federal court; damages law is substantive law." *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008). Since a contingent fee is calculated as a proportion of the damages to which successful plaintiffs are entitled—or, here, a portion of a settlement meant to preempt a jury's award of damages— we see no reason why laws permitting the modification of this payment should be considered merely procedural rather than substantive. We join our colleagues in other federal courts in characterizing judicial approval of settlements involving minors as a matter of substantive law. *See, e.g.,* *Burke v. Smith*, 252 F.3d 1260, 1265–66 (11th Cir. 2001); *Eagan v. Jackson*, 855 F. Supp. 765, 775 (E.D. Pa. 1994). Local Rule 17.1 applies to require the district court's review, but the substantive standard for that review is informed by Illinois law.

## B. Guideposts for the Exercise of Discretion

Less clear-cut is what exactly Illinois law prescribes as the appropriate analytical framework in the minor-settlement context. We review a court's award of attorney's

fees under a "highly deferential abuse of discretion stand-ard," but even this "'wide latitude' is not unlimited latitude, and the district court still bears the responsibility of justify-ing its conclusions." *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 639 (7th Cir. 2011) (quoting *Sottoriva v. Claps*, 617 F.3d 971, 975 (7th Cir. 2010)). The Illinois Probate Act does not expressly channel the trial court's discretion. Rather it simply requires that the minor's representative obtain "leave of court" before "compound[ing] or compromis[ing] any claim or any interest of the ward." 755 ILL. COMP. STAT. 5/19-8.

Even though the statute itself doesn't specify limits on the court's discretion, "[w]e have it on good authority that 'a motion to [a court's] discretion is a motion, not to its inclina-tion, but to its judgment; and its judgment is to be guided by sound legal principles.'" *Martin v. Franklin Capital Corp*. 546 U.S. 132, 139 (2005) (quoting *United States v. Burr*, 25 F. Cas. 30, 35 (No. 14692D) (C.C. Va. 1807)) (second altera-tion in original). "Discretion is not whim, and limiting discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike." *Id.* Although "the text of the provision does not specify any limits [on] the district court['s] discretion to allow or disallow fees, in a system of laws discretion is rarely without limits." *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 758 (1989). Our challenge is determining where those limits lie.

The law firm contends that any judicial review of attor-ney's fees begins and ends with reasonableness, which should be determined by reference either to the market rate for the services rendered or to the factors enumerated in the

Illinois Rules of Professional Conduct. However, at oral argument the firm conceded that it was unable to locate any Illinois cases applying these tests to litigation involving minors. The amicus argues that the trial judge enjoys broad discretion to safeguard the interests of minors but likewise acknowledges that Illinois caselaw offers no "detailed instructions" to structure this discretion.

Neither approach in isolation provides an appropriate framework for the trial judge's determination, much less for appellate review. But reading Illinois caselaw on attorney's fees together with cases involving minor settlements yields some appropriate criteria. There's no dispute that minors receive at least as much protection as adult litigants, so the court's review of attorney's fees in minor-settlement cases can be no less searching than in cases involving adults. Thus, the reasonableness of the fee structure serves as the floor for judicial review of minor settlements—and the appropriate starting point for our inquiry.

### 1. *Reasonableness*

The first measure of the objective reasonableness of an arrangement for attorney's fees is its consistency with the prevailing market rate. *See Palm v. 2800 Lake Shore Drive Condo. Ass'n*, 988 N.E.2d 75, 86 (Ill. 2013) ("The phrase 'reasonable attorney fees' has generally been interpreted to require use of the prevailing market rate in calculating a fee award."). In the contingent-fee context, this inquiry can take the form of a side-by-side comparison between the fee ultimately recovered and the lodestar, or what the client would have been charged under a fixed hourly billing

arrangement. *Watson v. S. Shore Nursing & Rehab. Ctr., LLC*, 965 N.E.2d 1200, 1213 (Ill. App. Ct. 2012) ("Under the lodestar approach, the starting point for calculating the amount of a reasonable attorney fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983))).

No one contends that the firm's fee exceeded the market value of its services. Before the district court intervened, the firm would have been entitled to $229,166.67. The firm pegs the relevant lodestar comparator at $283,554, calculated by multiplying the 1,194.9 hours billed at a rate of $300 for partners and $180 for associates. The amicus did not contest this figure, which the firm asserts is actually "below the market for Chicago." The judge acknowledged that he had "looked at the lodestar" and on that basis concluded that the attorney's fee "would be justified in ordinary terms." Thus, as a purely empirical matter, there was nothing unreasonable about the fee as calculated under the terms of the retainer agreement.

Nor was the fee excessive under the second, more qualitative test of reasonableness. Rule 1.5 of the Illinois Rules of Professional Conduct lists eight "factors to be considered in determining the reasonableness of a fee":

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> (8) whether the fee is fixed or contingent.

The Illinois courts have largely incorporated these factors into their reasonableness analysis, suggesting on multiple occasions that

> the trial court should consider a variety of additional factors such as the skill and standing of the attorneys, the nature of the case, the novelty and/or difficulty of the issues and work involved, the importance of the matter, the degree of responsibility required, the usual and customary charges for comparable services, the benefit to the client, and whether there is a reasonable connection between the fees and the amount involved in the litigation.

*LaHood v. Couri*, 603 N.E.2d 1165, 1171 (Ill. App. Ct. 1992) (citations omitted); *accord 1010 Lake Shore Ass'n v. Deutsche Bank Nat'l Trust Co.*, 19 N.E.3d 1, 9 (Ill. App. Ct. 2014); *Jacobs v. James*, 574 N.E.2d 1292, 1296 (Ill. App. Ct. 1991).

On this analysis, the firm's fee easily passes muster. At the initial hearing regarding the settlement, the judge acknowledged that the firm "did a terrific job for the client." In his final order, the judge took note of "the extensive time spent by plaintiffs' counsel in the hard-fought battle." There is no disagreement about the complexity of the litigation, which necessitated expansive discovery and the retention of numerous expert witnesses. After all, it was this degree of time-consuming and labor-intensive preparation that drove the litigation expenses deeply (in the district court's view, too deeply) into the Goesels' share of the recovery. It's ironic, then, that the "difficulty of the question[] involved"—which should work in the firm's favor here—served as a basis for the judge to *reduce* the firm's fee.

Without either a quantitative or qualitative basis for objection, the firm's bargained-for compensation cannot be called unreasonable.

### 2. *Interests of the Minor*

Having cleared the standard hurdle for judicial review of attorney's fees, the firm must now contend with Illinois's "strong public policy of protecting the interests of [the] minor." *First Nat'l Bank of LaGrange v. Lowrey*, 872 N.E.2d 447, 486 (Ill. App. Ct. 2007). As relevant here, Illinois courts conceptualize the interests of minor litigants in two ways.

The first is the tangible well-being of the particular minor involved in the litigation. *Leonard C. Arnold, Ltd. v. N. Trust Co.*, 506 N.E.2d 1279, 1281, 1283 (Ill. 1987) ("Courts are imbued with both the power and the duty to protect minors involved in litigation. … Simply because an attorney may not be subject to discipline for entering into a contingent agreement for a particular fee, it does not follow that the courts—which have a special duty to protect minors—must permit him to enforce an agreement for representing a minor in that amount."). To that end, the firm advised the court that "the portion of the settlement proceeds which Cole will receive after payment of attorney's fees and expenses … is sufficient to not only cover any future medical needs but is also sufficient to compensate him for his pain and suffering." Rather than addressing whether the sum was inadequate as a factual matter, the judge seemed offended that the firm even offered an opinion on this point. He speculated that in the event of a trial, "plaintiffs' counsel would have been arguing strenuously for a big-ticket figure for that intangible component of a damages award." He also criticized the firm's "subjective comment on the asserted value of the minor's pain and suffering" as "inappropriate[]."

The degree of vexation here is puzzling given that the judge inquired about this factor in the first place. During the initial hearing on the settlement, the judge expressed concern about Cole's "reasonable prospect of having continuing problems as a result of this terrible accident." That the firm addressed this concern in its amended submission is not only unobjectionable but fully consistent with its responsibility to advise the court on issues touching the minor's interests. It makes little sense to criticize the firm's opinion

regarding the settlement's sufficiency to protect the child when that's the very issue at the heart of the court's inquiry. Lost in the kerfuffle was any attempt by the judge to engage substantively with the factual question of the adequacy of the settlement to protect the child's interests—which, of course, leaves it beyond our grasp as a basis for affirmance.

The second, perhaps less obvious consideration is the court's duty to safeguard prospectively the interests of minor litigants as a class; that is to say, the incentives communicated to the bar by the court's rewriting of a private contract for legal representation of a minor. Noting that "[c]ontingent fee contracts … are the poor man's key to the courthouse door," the Illinois Supreme Court has held that the "duty to protect minors is consistent with the policy of promoting access to the courts through reasonable contingent-fee agreements." *Leonard C. Arnold, Ltd.*, 506 N.E.2d at 1281 (internal quotation marks omitted). If these contracts were categorically unavailable to minor litigants—or the risk of retrospective judicial abrogation rendered them so unappealing that the plaintiffs' bar would be wary of representing children—then "the likely result would be to deprive many minors of quality legal representation." *Id*. That outcome would conflict with Illinois public policy "that the rights of minors be guarded carefully." *Villalobos v. Cicero Sch. Dist. 99*, 841 N.E.2d 87, 93 (Ill. App. Ct. 2005). Those rights cannot be safeguarded if minor litigants can't make it into court in the first place.

Accordingly, a court should depart from the terms of a retainer agreement only when it has a good reason for doing so. Here, the firm's representation was competent, conscientious, and ultimately successful; the judge made no factual

findings that the minor's recovery was inadequate; and the fee was unquestionably reasonable under both the market-comparison and professional-responsibility rubrics. Among the criteria that Illinois courts have enumerated to govern attorney's fees in general and minor settlements in particular, none support abrogating the retainer agreement and rewriting the terms of the representation after the fact.

**C. Improper Bases**

The judge relied on additional factors outside the appropriate scope of its inquiry. To the extent the judge's umbrage at the firm's pain-and-suffering comment undergirded the decision, we find that basis neither logically nor legally compelling. And the judge's generalized reliance on "fairness and right reason" appears to be a rhetorical flourish.

More problematic, though, is the judge's apparent assumption that the retainer agreement was essentially a contract of adhesion. The judge recognized that "under ordinary circumstances … the sanctity of contracts calls for approval of [the] outcome." But this case was not out of the ordinary; as we've explained, the fee structure was not unreasonable, and nothing suggests that the minor's recovery was inadequate. Rather, the judge was disquieted by "the inherent inequality of bargaining power as between lawyer and client in the initial discussion in which fees are agreed upon."

This overlooks the reality that contingent-fee contracts play a vital role in our legal system. Declining to enforce these arrangements because they are "inherent[ly]" unequal would uproot the contingent-fee mechanism with disastrous

consequences for those unable to pay lawyers upfront. And even if attorney-client bargaining *may* be unconscionable under certain circumstances, there is no indication that the Goesels felt that they could not negotiate the terms of their contract with the law firm or shop their case to other firms in search of a better deal.

Finally, to the extent that the judge classified the retainer agreement as a contract of adhesion and on that basis declined to enforce it, this reasoning was unsound. The Illinois Supreme Court has recognized that "contract[s] of adhesion," whose "terms … are nonnegotiable and presented in fine print in language that the average consumer might not fully understand, … are a fact of modern life." *Kinkel v. Cingular Wireless LLC*, 857 N.E.2d 250, 266 (Ill. 2006). Nothing suggests that the retainer agreement even fits this description. Moreover, the fact that an agreement is a contract of adhesion does not automatically defeat enforceability. *Phoenix Ins. Co. v. Rosen*, 949 N.E.2d 639, 654 (Ill. 2011) ("[E]ven if we accept … that [an] … agreement is a contract of adhesion, such a finding does not render the agreement unenforceable.").

Rather, Illinois courts have required "[s]ome added coercion or overreaching" before they will hold a contract of adhesion unenforceable. *Tortoriello v. Gerald Nissan of N. Aurora, Inc.*, 882 N.E.2d 157, 175 (Ill. App. Ct. 2008); *see also Abbott v. Amoco Oil Co.*, 619 N.E.2d 789, 795 (Ill. App. Ct. 1993) ("[U]nfair advantage is the key to differentiating between the types of adhesion contracts … ."). There's no indication here that the retainer agreement was the product of such gross inequity that it qualifies as procedurally unconscionable, which is the standard for non-enforcement

under Illinois law.[2] *See Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (Ill. 2006) ("Procedural unconscionability refers to a situation where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and also takes into account a lack of bargaining power.").

Aside from unconscionability, a contract's adhesive nature is relevant only in construing its ambiguous terms. *Abbott*, 619 N.E.2d at 798. Clauses susceptible of more than one meaning, particularly those that may prove "onerous" to one of the parties, should be "construed against the party with superior bargaining power." *Methodist Med. Ctr. of Ill. v. Taylor*, 489 N.E.2d 351, 356 (Ill. App. Ct. 1986). But the record is bereft of any suggestion that this retainer agreement was ambiguous or that the Goesels were hoodwinked into a compensation arrangement that was unclear on its face. The judge's concern that the firm had drawn up a contract of adhesion was unwarranted.

The core problem with the judge's ruling in this case is that it rests on nothing more than a series of unwarranted criticisms. Had the judge expressed all the same concerns over adhesive contracts and the lawyers' subjective views while still rooting his decision in some genuinely unreasonable or objectionable aspect of the agreement, the deferential

---

[2] The judge appeared more concerned with *substantive* unconscionability, which "refers to those terms which are inordinately one-sided in one party's favor." *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (Ill. 2006). But the substantive inquiry is directed to the operation of the contract, not the process by which it was negotiated and entered; whether an agreement is an adhesion contract is immaterial to the question of substantive unconscionability.

standard of review would require us to affirm on the legitimate ground alone. What we're left with, however, is the judge's invocation of "fairness and right reason," and that incantation cannot support an exercise of discretion where no argument for *un*fairness or *wrong* reason survives. The district court abused its discretion not by relying on several bad reasons but by relying on no good one.

### D. Computerized Research

The firm sought to include as a recoverable litigation expense nearly $10,000 for computerized legal research. The judge excluded this expense from the firm's recovery, holding that electronic research merely "cuts down on a lawyer's expenditure of his or her more tedious research time" for which the firm was already compensated as part of the contingent fee.

Whether computerized legal-research expenses are recoverable is a question relevant to the calculation of damages. As we've explained, this is a matter of substantive law and thus is governed by state law. Conveniently, on this question the Illinois courts have adopted our rule. *Guerrant v. Roth*, 777 N.E.2d 499, 506 (Ill. App. Ct. 2002) ("[F]ederal courts in Illinois have more thoroughly addressed the issue of reimbursement of computer-assisted legal research charges.").

The firm argues that there is tension in our caselaw on the question whether these research expenses should be separately recoverable. That's not accurate. Our circuit's rule is straightforward: In fixed-fee cases, these charges are not

separately recoverable; in lodestar cases, they are.[3] *See, e.g.,* *Montgomery v. Aetna Plywood, Inc.,* 231 F.3d 399, 409, n.3 (7th Cir. 2000) ("When a court uses the percentage-of-recovery method of calculating attorney's fees, such charges are simply subsumed in the award of attorneys' fees. … When a court uses the lodestar method of calculating attorney's fees, computer research charges are separately recoverable, but (and this is the important point) only as a type of attorneys' fee, not as an expense.").

Here is how the Illinois Appellate Court has explained the rationale for treating computerized research differently in fixed-fee and lodestar cases:

---

[3] That our caselaw is consistent is not to say that the distinction we've drawn continues to make sense. The background assumption is that lawyers are mainly reliant on *non*-computerized research methods—or, at the very least, that an entirely offline research system remains a viable option for practicing law in 2015. It strikes us as anachronistic to conceptualize computerized legal research as a mere time-saving shortcut deviating from the standard practice of leafing through copies of caselaw reporters. To the extent this logic was ever compelling, it has long since fallen out of step with prevailing legal practice.

However, this case is not the proper vehicle for revisiting our rule on the separate recoverability of these expenses. The retainer agreement was concluded under the rule distinguishing between lodestar and fixed-fee arrangements; abruptly shifting the legal landscape now would have the collateral effect of disrupting one of the presumptions that may have guided the contracting parties (if only marginally). And as a procedural matter, we are sitting in diversity and applying Illinois law. Consequently, we leave for another day the question whether, decades into the digital age, there remains any logical rationale for treating computerized legal research as a novel indulgence.

> Where the attorney's fee is a contingent one or is otherwise fixed so as not to reflect the actual time spent on a cause of action, the rationale that the computer expense is counter-balanced by a benefit to the attorney in saving time holds water because the fee remains unchanged, while the time expended on research is reduced. On the other hand, where an attorney works on a *per diem* basis, the time he saves does not inure to his economic benefit because he will simply be paid for fewer hours, while nevertheless incurring the expense of computer assistance. Under these circumstances, the rationale for attorney advantage falls away, and the attorney should not be required to absorb the additional expense engendered by computer research fees in light of the diminished billable hours that result from such computer assistance.

*Johnson v. Thomas*, 794 N.E.2d 919, 935 (Ill. App. Ct. 2003) (internal citations and quotation marks omitted). Applying this rule here, it was not error to exclude the firm's computerized-research costs from the recoverable litigation expenses.

For the foregoing reasons, the district court's judgment is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.